**UNITED BISCUIT COMPANY OF AMERICA, Petitioner,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

**No. 14639.**

United States Court of Appeals Seventh Circuit.

Aug. 9, 1965.

Roland D. Whitman, Bruce J. Mc-Whirter, Chicago, Ill., for petitioner, Ross, Hardies, O'Keefe, Babcock, McDugald & Parsons, Chicago, Ill., of counsel.

J. B. Truly, Asst. Gen. Counsel, Miles J. Brown, Atty., F. T. C., James McI. Henderson, Gen. Counsel, Washington, D. C., for the F. T. C.

Before HASTINGS, Chief Judge, and DUFFY and SWYGERT, Circuit Judges.

SWYGERT, Circuit Judge.

Petitioner United Biscuit Company of America seeks review of a cease and desist order of the Federal Trade Commission and a subsequent order of the Commission denying a stay of the cease and desist order. The Commission found petitioner guilty of violating section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a).[1]

United is a Delaware corporation with its principal office and place of business in Melrose Park, Illinois. It manufactures and sells cookies and crackers, referred to collectively as biscuit products. Petitioner conducts its operations through eight geographical divisions. The Sawyer Division covers an area comprising Illinois, and portions of Indiana, Iowa, Wisconsin, Michigan, Kentucky, and Missouri.

The activities investigated by the Commission dealt with sales by the Sawyer Division to its retail grocery store customers during the year 1959. These customers can be divided into those owning and operating only one grocery store, referred to in the complaint as "independents," and those owning and operating more than one store, referred to as "chains." The latter include major corporate chains, such as The Great Atlantic & Pacific Tea Company, The Kroger Company, and National Food Stores, as well as smaller corporate or individually owned chains.

The complaint charged that the Sawyer Division used graduated monthly discount schedules to discriminate in price between its customers; that these schedules, allowing for discounts up to six per cent, were based on the dollar volume of purchases made by each store; and that if a purchaser had more than one store, such as a corporate chain, its discount was calculated on the basis of the aggregated purchases of the stores operated by that purchaser. As a result, it was alleged, individual outlets of the chains as well as supermarkets (large independents) were enabled to earn larger discounts than competing smaller independents. In its answer, United ad-

---

1. Section 2(a) provides in pertinent part:
 It shall be unlawful for any person engaged in commerce, * * * to discriminate in price between different purchasers of commodities of like grade and quality, * * * where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition * * *.

mitted that its Sawyer Division priced pursuant to the challenged discount schedules, and that some of Sawyer's purchasers "who own only one retail grocery store may from time to time receive no discount or less than six per cent depending on the volume of their purchases, and that the volume of their purchases may be more than those for an individual store owned by purchasers owning more than one such store." United did not attempt to defend its policy by urging cost justification or a meeting of competition.

The Commission's case with respect to the actual operation of petitioner's discount practices was based on the purchases made and the discounts earned during two separate three-month periods of 1959 by thirteen independent stores and by a few chain store outlets located in portions of three communities served by the Sawyer Division—Gary, Indiana; South Bend, Indiana; and Burlington, Wisconsin. The purchases and discounts for each test store during the six months involved are not in dispute. They are set out at length in the record.[2] They

2. The following is a representative example of the discount payments made to the test stores:

### GARY, INDIANA

| STORE | Monthly Purchases | Per Cent Discount | Discount Payable | Additional Amount Payable at 6% |
|---|---|---|---|---|
| **January 1959** | | | | |
| Independents: | | | | |
| Better Foods, Inc. | $ 11.67 | 0 | $ 0.00 | $ .70 |
| Gene's Super Market | 117.16 | 5 | 5.86 | 1.17 |
| Tobe's Super Market | 319.42 | 6 | 19.17 | — |
| Wally's Fifth Avenue Mart | 45.37 | 4 | 1.81 | .91 |
| Chains: | | | | |
| A & P | 82.61 | 6 | 4.96 | — |
| Kroger Store No. 628 | 43.42 | 6 | 2.61 | — |
| **February 1959** | | | | |
| Independents: | | | | |
| Better Foods, Inc. | 18.82 | 0 | 0.00 | 1.13 |
| Gene's Super Market | 116.38 | 5 | 5.82 | 1.16 |
| Tobe's Super Market | 333.97 | 6 | 20.04 | — |
| Wally's Fifth Avenue Mart | 43.21 | 3 | 1.30 | 1.29 |
| Chains: | | | | |
| A & P | 62.79 | 6 | 3.77 | — |
| Kroger Store No. 628 | 47.28 | 6 | 2.84 | — |
| **March 1959** | | | | |
| Independents: | | | | |
| Better Foods, Inc. | 41.68 | 3 | 1.25 | 1.25 |
| Gene's Super Market | 130.95 | 6 | 7.86 | — |
| Tobe's Super Market | 439.88 | 6 | 26.39 | — |
| Wally's Fifth Avenue Mart | 33.19 | 2 | .66 | 1.33 |
| Chains: | | | | |
| A & P | 83.13 | 6 | 4.99 | — |
| Kroger Store No. 628 | 103.94 | 6 | 6.24 | — |
| **October 1959** | | | | |
| Independents: | | | | |
| Better Foods, Inc. | 28.35 | 1½ | .42 | 1.28 |
| Gene's Super Market | 66.63 | 2½ | 1.67 | 2.33 |
| Tobe's Super Market | 170.71 | 6 | 10.24 | — |
| Wally's Fifth Avenue Mart | 24.78 | 0 | 0.00 | 1.49 |

indicate that most of the major retail grocery stores and a few of the large independents received a 6 per cent volume discount. Other stores received discounts varying from 1½ per cent to 5 per cent. Some received no discount. The Commission found that as a result of the differences in the volume discounts, United charged some customers a higher price for like goods than it charged a competing customer or competing customers.

After counsel in support of complaint had rested his case in chief, United moved to dismiss the complaint. The hearing examiner granted the motion on the ground that although United's pricing practices "may constitute a price discrimination under § 2(a) of the Clayton Act," the Commission had not "sustained the burden of proof of competitive injury imposed upon [it] by law."

On appeal by counsel in support of the complaint, the Commission set aside the examiner's decision and remanded the case to him, stating that unless the showing on the record was "rebutted or justified, the evidence is suffi-cient to support an order against respondent to cease and desist. * * *" No further evidence was introduced by either party. Upon remand the examiner issued a new initial decision and concluded that a violation of section 2(a) had been established. He issued an order requiring that United:

[I]n connection with the sale and distribution of * * * [its] products, including cookies and crackers * * * cease and desist from discriminating, directly or indirectly, in the price of such products of like grade and quality by selling to any purchaser at net prices higher than the net prices charged any other purchaser who, in fact, competes with the purchaser paying the higher price.

United thereupon petitioned the Commission to review the hearing examiner's decision, challenging the sufficiency of the evidence and the findings as showing a violation of the Act, and also objecting to the scope of the examiner's order.

### GARY, INDIANA

| STORE | Monthly Purchases | Per Cent Discount | Discount Payable | Additional Amount Payable at 6% |
|---|---|---|---|---|
| Chains: | | | | |
| A & P | 26.28 | 6 | 1.58 | — |
| Kroger Store No. 628 | 123.27 | 6 | 7.40 | — |
| November 1959 | | | | |
| Independents: | | | | |
| Better Foods, Inc. | 25.02 | 1½ | .38 | 1.12 |
| Gene's Super Market | 138.92 | 5 | 6.95 | 1.39 |
| Tobe's Super Market | 99.93 | 3½ | 3.50 | 2.50 |
| Wally's Fifth Avenue Mart | 26.64 | 1½ | .40 | 1.20 |
| Chains: | | | | |
| A & P | 50.60 | 6 | 3.04 | — |
| Kroger Store No. 628 | .56 | 6 | 0.03 | — |
| December 1959 | | | | |
| Independents: | | | | |
| Better Foods, Inc. | 21.86 | 0 | 0.00 | 1.31 |
| Gene's Super Market | 106.05 | 3½ | 3.71 | 2.65 |
| Tobe's Super Market | 0.00 | 0 | 0.00 | — |
| Wally's Fifth Avenue Mart | 58.30 | 2 | 1.17 | 2.33 |
| Chains: | | | | |
| A & P | 57.33 | 6 | 3.44 | — |
| Kroger Store No. 628 | 14.86 | 6 | 0.89 | — |

During the pendency of the review proceeding before the Commission, United filed a motion for certain compliance reports filed with the Commission by National Biscuit Company and Sunshine Biscuits, Inc., the two major competitors of United. United alleged that National and Sunshine appeared to be granting quantity discounts on biscuit products to their retail grocery customers despite the existence of certain outstanding cease and desist orders against them, and that issuance of an order against United banning all purchase discounts would place petitioner at a competitive disadvantage. The Commission denied the request for disclosure stating that the reports had not been acted upon by it and that, in any event, there had been an insufficient showing that the orders in the other cases were relevant to this case since "each matter before the Commission must be considered on its own merits."

The Commission thereafter issued its final opinion. It adopted the examiner's findings and conclusions with minor modifications not pertinent to the instant review. The Commission concluded that United's price discriminations "may be substantially to lessen competition * * * and to injure, destroy, and prevent competition * * *" and that accordingly United had violated section 2(a) of the Clayton Act. In formulating its cease and desist order, the Commission modified the examiner's order by substituting for the phrase "their products, including cookies and crackers" the phrase "their food products," and limited the order to sales to purchasers competing in the resale of petitioner's products, but rejected United's contention that the order should be limited to "biscuit products." The Commission in its decision rejected petitioner's contention that the violation of the Act found here consisted only of favoring chains as against independents by permitting the former to combine the purchases of their outlets. It held that there was "a violation shown with or without the evidence of the combining of chain purchases." The Com-

mission also rejected petitioner's request that the order be limited so as to cover only this practice.

United thereafter moved the Commission to withdraw entry of its order and to stay its re-entry until the Commission had completed the proceedings pending against National and Sunshine. This motion was denied. United then filed the instant petition for review.

United raises three separate issues: (1) whether the Commission's finding that petitioner's pricing practices may be to adversely affect customer competition is supported by substantial evidence; (2) whether the Commission's order is too broad in its scope; and (3) whether the Commission abused its discretion by refusing to stay the effective date of its order until it had passed upon the compliance by petitioner's competitors with orders issued against them.

I.

■ Section 2(a) of the Clayton Act prohibits price discriminations when the effect "*may be substantially* to lessen competition * * * or to injure, destroy, or prevent competition." (Emphasis added). In applying the statute, this court in Whitaker Cable Corp. v. F.T.C., 239 F.2d 253, 256 (7th Cir. 1956), cert. denied, 353 U.S. 938, 77 S.Ct. 813, 1 L.Ed.2d 761 (1957), said that price differentials *per se* are not outlawed. "The Act was not intended to reach every remote, adverse effect on competition. The effect must be substantial." It is also important, however, to remember that price discriminations do not need to have resulted in actual injury in order to come within the statutory ban. "It is enough that they may have the prescribed effect." E. Edelman & Co. v. F.T.C., 239 F.2d 152, 154 (7th Cir. 1956), cert. denied, 355 U.S. 941, 78 S.Ct. 426, 2 L.Ed.2d 422 (1958). Thus the statute seeks "to reach such discriminations 'in their incipiency,' before the harm to competition is effected." Corn Products Refining Co. v. F.T.C., 324 U.S. 726, 738, 65 S.Ct. 961, 967, 89 L.Ed. 1320 (1945).

United contends that the evidence does not support the finding that its discount practices result in price discriminations that may substantially lessen competition. It says that the discounts are, under any view, insubstantial. It maintains that the small dollar amounts earned by those customers granted discounts are minimal even when they constitute the maximum six per cent discount. Consequently, United argues that the discounts, particularly when translated into dollar amounts, are incapable of producing any anticompetitive effect.

■ We realize that the dollar amounts representing the discount differentials are small and not as great as those found in many prosecutions for section 2(a) Clayton Act violations. Nevertheless, for reasons hereinafter given, we think there was sufficient evidentiary support for the Commission's finding that there was a likelihood of substantial anticompetitive injury.

The fact that the discounts granted by United increase up to six per cent belies the claim that the price differentials as such are insubstantial. The apparent purpose of a graduated discount system is to afford some customers greater profits. As the volume of a customer's purchases grows the percentage of his discount increases, resulting in the opportunity either to realize a greater margin of profit per package or to reduce his retail price in relation to his competitors. There would seem to be no purpose for United to burden itself with maintaining its pricing practices unless it believed that the discounts are sufficiently attractive to induce a greater volume of purchases from its customers. It follows that if the discounts are intended as an inducement, necessarily they must be considered of a substantial character.

■ United correctly points out, however, that the "substantiality" requirement of the statute relates not to the price differentials, but to their effect upon competition. It then charges that the Commission ignored this distinction by holding that substantial injury to competition may be inferred if the discount to one customer is substantially more than that given his competitors. In other words, United argues that in effect the Commission applied a *per se* test in finding that the anticompetitive effect of petitioner's pricing practices would be substantial rather than minimal. We are convinced, however, that the Commission did not make the finding solely on the basis of the differences in the percentages of the discounts or of the amounts of the discriminations. All of the facts and circumstances of the case, including the amount of the discounts, were considered by the Commission in reaching its conclusion.

Independent store owners testified generally as to the highly competitive nature of the retail food business and that net profits are low; consequently, cash discounts and other allowances are important. One store owner testified "[W]e have to fight not only for pennies but for fractions." Moreover, certain of the independent store witnesses testified that price was a very important, if not the most important, factor in enabling them to compete. There was also testimony from these witnesses to the effect that if they could buy cheaper they could sell for less and that customers will, in the overall picture, buy where the prices are lower. The Commission said that "considering the highly competitive nature of the market and the other factors mentioned, a volume discount of 6% * * * was clearly substantial. Likewise substantial were the lesser discounts shown ranging up to 6%." The Commission concluded that there was sufficient evidence "to find that the competitive opportunities of certain purchasers were injured when they had to pay respondent [United] substantially more than their competitors had to pay and that the effect may be substantially to injure, destroy or prevent competition with the purchasers receiving the benefit of such discriminations."

■ United claims that the majority of independent store owners who testified stated that they would not be adversely affected by the discount differentials re-

ceived on United's products. In this connection petitioner calls attention to the examiner's statement:

The witnesses were asked whether their business would be substantially affected or injured by receiving a lesser discount than a competitor on the same amount of purchases of respondent's products. Six replied in the negative. One testified that he would be injured only if competitors substantially cut their prices; the answers of three others were inconclusive. One answered in the affirmative.

Regardless of this, we are of the opinion that the "substantiality" question here does not depend upon the store owners' estimation of the possibility of injury by reason of United's pricing practices. The incipient harm to competition that may be present if the challenged discriminations should continue is not to be determined solely by the opinions of the store owners. That determination must be made by the Commission through an exercise of its special competence and upon the basis of all the attendant facts and circumstances with particular reference to the type of business under investigation.

■■ We are in agreement with the Commission that the test for competitive injury set forth in F.T.C. v. Morton Salt Co., 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196 (1948), should govern this proceeding. There, the Court was confronted with the sale of an item, which like those in the present case, was a relatively minor one when considered in the overall operations of a retail grocery store. Nevertheless, in prohibiting the price discriminations found in that case, the Court said:

There are many articles in a grocery store that, considered separately, are comparatively small parts of a merchant's stock. Congress intended to protect a merchant from competitive injury attributable to discriminatory prices on any or all goods sold in interstate commerce, whether the

particular goods constituted a major or minor portion of his stock. Since a grocery store consists of many comparatively small articles, there is no possible way effectively to protect a grocer from discriminatory prices except by applying the prohibitions of the Act to each individual article in the store. Supra at 49, 68 S.Ct. at 829.

United argues that Morton Salt holds that competitive injury caused by discounts given on one product cannot be justified merely because the customer deals in many other products. It is true that this is one possible interpretation of the Court's language. It is possible, however, to find in it a quite different meaning, namely, that even though price discriminations covering a single item in a grocery store may appear relatively insignificant when considered alone, they may assume the stature of substantiality when considered in the context of the store's total operation and as an incipient harm which could grow into reality if extended to all of the items handled by the grocer. We believe that this latter interpretation is the correct one and that it should be adopted in testing the likelihood of substantial competitive harm inherent in United's pricing practices.

■ United also contends that the Commission's order extends beyond those price discriminations challenged in the complaint, that is, that it has ruled illegal all price discriminations using the volume discount schedules and did not limit the illegality to those discriminations that arose from its practice of allowing chains to combine the purchases of their various outlets located within a particular area. We have read the complaint and examined the record. We find that the Commission's order is consistent with its complaint and with the theory on which it prosecuted this case. We agree with the Commission's statement: "The combining of the purchases of chain store outlets was a contributing factor, but the real illegality here found was due to the differences in net prices

as a result of using volume discount schedules. There is a violation shown with or without the evidence of the combining of chain purchases."

## II.

United next challenges the Commission's order as being too broad in its scope: (1) in its products coverage by issuing an order covering "food products" rather than "cookies and crackers" and (2) in its prohibition of practices by not restricting the order to the price discriminations arising from the outlet-combining aspect of its discount schedules.

 Having found that there was warrant for the Commission's finding that United violated section 2(a) in the distribution of its biscuit products, we hold that the Commission was authorized to fashion its order to prohibit United's use of such illegal practices in the distribution of any of its "food products." In other cases it has been held that it is reasonable for the Commission to frame its order in such a way as to prohibit practices found to be illegal in the sale of one product in conjunction with the sale of other products. F.T.C. v. Colgate-Palmolive Co., 380 U.S. 374, 85 S.Ct. 1035, 13 L.Ed.2d 904 (1965); Niresk Indus. v. F.T.C., 278 F.2d 337 (7th Cir. 1960), cert. denied, 364 U.S. 883, 81 S.Ct. 173, 5 L.Ed.2d 104.

In challenging the broad formulation of product coverage, United cites F.T.C. v. Henry Broch & Co., 368 U.S. 360, 82 S.Ct. 431, 7 L.Ed.2d 353 (1962), as authority for the proposition that the 1959 amendments to section 11 of the Clayton Act require that the Commission orders be very narrow and precise.[3] It should be noted, however, that the language quoted from Broch by petitioner here did not refer to that part of the order in

Broch relating to broad product coverage. The recent decision in Colgate-Palmolive Co., supra, indicates that Broch cannot be held as authority for the proposition which petitioner urges.

United also challenges the Commission's order as being too broad in prohibiting all price discriminations resulting from the use of volume discount schedules and not limiting it to those situations in which the purchases of multiple chain outlets in a particular area were combined for the purpose of discounts. This argument is consistent with petitioner's contention that this proceeding was limited to the outlet-combining aspect of the discount schedules. Having determined as we have earlier that the Commission's decision was consistent with the complaint and the theory on which it prosecuted this case, we now rule that the order is not too broad in its prohibitions but covers those practices which United was found to have used and which were determined to be violative of the Act.

## III.

 Petitioner contends that the Commission erred in refusing to stay the effective date of its order until the Commission has completed its pending proceedings against petitioner's competitors. In earlier proceedings, the Commission prohibited both National Biscuit Company and Sunshine Biscuits, Inc. from offering the type of price discounts similar to those used by United. Both of these competitors have now submitted compliance reports to the Commission which has not as yet determined whether the reports establish compliance. Petitioner urges that the order against it should not issue until it has been determined whether or not its competitors are complying with the Commission's

3. Petitioner cites the following from F.T.C. v. Henry Broch & Co., 368 U.S. 360, 367–368, 82 S.Ct. 431, 436 (1962): We do not wish to be understood, however, as holding that the generalized language of paragraph (2) would necessarily withstand scrutiny under the 1959 amendments. The severity of pos-

sible penalties prescribed by the amendments for violations of orders which have become final underlines the necessity for fashioning orders which are, at the outset, sufficiently clear and precise to avoid raising serious questions as to their meaning and application.

orders. If they are not, petitioner argues, and if United does comply with the present order against it, it will be placed at a serious competitive disadvantage. We agree with the Commission that the compliance or noncompliance of the other companies is a separate question which ought to be considered on its own merits. The Commission need not hold an order against one company in abeyance until it proceeds similarly against all others. Otherwise, Commission orders would be forever pending and unlawful practices rarely, if ever, corrected. The "decision as to whether or not an order against one firm * * * should go into effect before others are similarly prohibited depends on a variety of factors peculiarly within the expert understanding of the Commission." Moog Indus., Inc. v. F.T.C., 355 U.S. 411, 413, 78 S.Ct. 377, 379, 2 L.Ed.2d 370 (1958).

The Commission's orders are affirmed and the cease and desist order will be enforced.