**FORSTER MFG. CO., Inc., et al.,**
**Petitioners,**

v.

**FEDERAL TRADE COMMISSION,**
**Respondent.**

**No. 6134.**

United States Court of Appeals
First Circuit.

Heard Dec. 3, 1963.

Decided July 29, 1964.

Richard A. Tilden, New York City, with whom Joseph B. Campbell, Augusta, Me., was on brief, for petitioners.

J. Richard Carr and Thomas F. Howder, Attys., Federal Trade Commission, with whom James McI. Henderson, Gen. Counsel, and J. B. Truly, Asst. Gen. Counsel, were on brief, for respondent.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

WOODBURY, Chief Judge.

Forster Mfg. Co., Inc., is a Maine corporation with its principal office and its plant in Farmington, Maine, where it manufactures a wide variety of "woodware products" consisting among other items of meat skewers, toothpicks, clothespins, tongue depressors, ice cream sticks, spoons, cocktail forks and cocktail spears. Theodore R. Hodgkins, of Farmington, Maine, is its president, one of its directors, its principal stockholder and, the evidence clearly shows, its policy maker and the one in direct, active, overall control and management of its affairs.

In July, 1958, the Federal Trade Commission issued a complaint alleging the corporation to be the "dominant Manufacturer and nationwide seller" of about 25 "woodware products" "consisting of clothes-pins, toothpicks, eating utensils, ice cream sticks, skewers and similar products" and charging it and Hodgkins with violating § 2(a) of the Clayton Act, 38 Stat. 730, as amended by the Robinson-Patman Act, 49 Stat. 1526, 15 U.S.C.

§ 13(a), by directly or indirectly discriminating in price between purchasers of its products of like grade and quality by selling its products "in each of several trade areas" at higher prices to some purchasers than to other favored purchasers "many of the favored purchasers being in competition with non-favored purchasers." Specifically, the complaint charges price discrimination between purchasers of meat skewers, particularly in the Chicago market. The complaint alleges that the effect of the corporate respondent's discriminations in price between purchasers of its products in general "may be substantially to lessen, injure, destroy, or prevent competition between respondent corporation and competing manufacturers and sellers" of similar products and that the effect of its discriminations in the price of its meat skewers in particular "has resulted in a tendency toward monopoly in the respondent corporation in the manufacture and sale" of that item.

In November, 1958, the respondents filed separate answers. The corporate respondent admitted that it manufactured and sold "woodware products" on a nationwide basis but denied that it was "dominant" in that field, denied that it had discriminated in price between the purchasers of its products generally in various trade areas but admitted that it had sold its skewers at various delivered prices in different areas of the United States. The individual respondent admitted that he was the president, a director and the principal stockholder of the respondent corporation but denied his responsibility for its conduct "except to the extent of his participation" in its affairs as a corporate officer. Otherwise his answer paralleled that of the corporation. Both respondents denied that they had engaged in illegal price discriminations as alleged.

In March, 1959, the respondents amended their answers to assert in defense that any lower price to any purchaser of "woodenware" was made either in good faith to meet an equally low price of a competitor or made "only due al-

lowance for differences in the cost of manufacture, sale or delivery resulting from differing methods or quantities in which such woodenware" was sold to purchasers.

Hearings began in Augusta, Maine, on March 16, 1959, in the course of which the hearing examiner ruled that he would take no evidence with respect to any product other than meat skewers without amendment of the complaint specifying the other products involved. Thereupon in May, 1959, counsel supporting the complaint moved for amendment by inserting a new paragraph as follows: "Specific woodenware products with respect to which such discriminations have occurred are: meat skewers, toothpicks, clothespins, tongue depressors, ice cream sticks, spoons, cocktail forks and cocktail spears." Counsel for the respondents opposed the proposed amendment and moved for a bill of particulars should it be allowed. The hearing examiner allowed the amendment but denied the motion for a bill of particulars and the Commission denied an interlocutory appeal from these rulings. This action of the Commission raises the first question presented by this petition under § 5(c) of the Federal Trade Commission Act as amended 52 Stat. 112, 15 U.S.C. § 45(c), for review of the Commissioner's final order in this case.

The petitioners contend that the Commission's action on its counsel's motion to amend the complaint and on their motion for a bill of particulars was unfair, prejudicial, in violation of the Commission's Rules of Practice and, indeed, denied them due process of law.

■■ It is true that the Commission's original complaint singled out meat skewers as a specific "woodenware product" with respect to which the respondents had violated the Act. But the complaint also charged the respondents with violating the Act with respect to "woodenware products" generally, and the respondents in their answers denied that charge. To be sure the only prod-

uct specifically referred to in either the complaint or the answers was wooden meat skewers. But we think it could hardly be assumed that those were the only products which might be involved in the case, for the pleadings were not specifically limited to those products. Amendment was in order to include other products. However, to say that it was out of order as a matter of law to allow such amendment, would be to impose limitations on the power to amend quite out of line with present-day views as embodied in Rule 15(a) F.R.Civ.P., which provides that, even after a responsive pleading, leave to amend "shall be freely given when justice so requires." We see no reason to apply a stricter rule to administrative agencies nor do we see any violation of the Commission's Rules. Since the complaint and the answers foreshadowed inquiry into items other than skewers, we do not see how the respondents could have been surprised in a legal sense by the motion to amend. Nor, since the amendment was allowed by the hearing examiner on June 30, 1959, and appeal therefrom denied by the Commission on September 10, 1959, and the hearings continued at various times and in various places for over two years thereafter, do we see how the respondents can be heard to say that they did not have a fair opportunity to prepare their defense to the complaint as amended. And the complaint adequately apprised the respondents of the charges laid against them, for it was couched in the words of the Act.

■ The next proposition advanced by the respondents-petitioners is that the Commission's [1] criteria of injury to competition are erroneous as a matter of law. Their contention is that a finding of injury to competition can be made only when the evidence shows "a substantial impairment of the vigor or health" of the competitors affected. This contention flies squarely in the face of the words of the statute itself and of its interpretation by the Supreme Court of the

---

1. Two commissioners did not participate, and a third dissented.

United States in a case to be considered presently.

Section 2(a) of the Clayton Act as amended, 15 U.S.C. § 13(a) quoted in presently pertinent part in the margin,[2] proscribes price discriminations which *may* substantially lessen competition or tend to create a monopoly in any line of commerce or *may* injure, destroy, or prevent competition with any person granting or receiving the benefits of such discriminations or with their customers. In effect the respondents' contention would read the word "may" out of the statute and, indeed, substitute therefor the word "does." This, of course, may not be done as the Supreme Court categorically decided in Federal Trade Commission v. Morton Salt Co., 334 U.S. 37, 46, 68 S.Ct. 822, 92 L.Ed. 1196 (1948), wherein the Court held that the statute does not require the Commission to find that injury has actually resulted from a respondent's discounts. It said: "The statute requires no more than that the effect of the prohibited price discriminations 'may be substantially to lessen competition * * * or to injure, destroy, or prevent competition.' After a careful consideration of this provision of the Robinson-Patman Act, we have said that 'the statute does not require that the discriminations must in fact have harmed competition, but only that there is a reasonable possibility that they "may" have such an effect.' Corn Products [Refining] Co. v. Federal Trade Comm'n, 324 U.S. 726, 742, 65 S.Ct. 961, 969, 89 L.Ed. 1320.[3] Here the Commission found what would appear to be obvious, that the competitive opportunities of certain merchants were injured when they had to pay respondent substantially more for their goods than their competitors had to pay. The findings are adequate." Nothing more needs to be said to refute this contention, and we turn to the facts.

The hearing examiner held that the evidence in the record did not support the charges leveled by the Commission against the respondent with respect to toothpicks, tongue depressors, cocktail forks and cocktail spears and dismissed the Commission's complaint as to those items. He found price discrimination with respect to ice cream sticks, but no sufficient evidence of adverse effect on competition therefrom to warrant the conclusion of violation of the Act. Thus only skewers, clothespins and ice cream spoons remain in the case. As to these items he found price discriminations impairing competition only between sellers, known as "primary-line" competition, which the Court in Federal Trade Commission v. Anheuser-Busch, Inc., 363 U.S. 536, 80 S.Ct. 1267, 4 L.Ed.2d 1385 (1960), held to be within the scope of the Act.

The facts are complex. They are embodied in numerous exhibits consisting of orders, vouchers and the like and tables showing the respondents' prices in various areas at various times during the years involved and the testimony of many witnesses reproduced in the record appendices in fragments out of context and skipping about from witness to witness and from product to product and back again. For clarity we shall consider the products in the order enumerated herein above.

Forster's skewer plant burned down in 1947. Rather than rebuild at the time

2. "It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States * * * [or any place under its jurisdiction] and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them * * *."

3. In this case at page 738, 65 S.Ct. at page 967 the Court said that § 2(a) is designed to reach discriminations " 'in their incipiency,' before the harm to competition is effected."

Forster began to buy its skewer requirements from a local competitor, Farmington Dowel Products Company, which at that time was a proprietorship owned by one Barrows but was later purchased by one Norton who incorporated the enterprise and later turned it over to his son. It and Forster were the only two producers in the country who manufactured a full line of skewers and together they dominated the market.

Forster took about 70% of Farmington's production of skewers, which was by far its major product. Farmington had no sales organization. It sold the balance of its skewer production to an English concern, a large domestic meat packer, Swift & Co., and to a few small distributors who, although called "brokers" in the trade, took title to the goods.

In 1952 Forster began to manufacture some sizes of skewers itself, and in 1954 Hodgkins wrote to the younger Norton, who had just succeeded his father in control of Farmington, that because of competition in the market for skewers Forster had to have a 10% to 15% reduction in the price it was paying Farmington. The Commission found that it was discovered later that Forster had not reduced its prices but in fact had actually increased its prices on some items. The following year in February, when Farmington had a peak inventory of lumber on hand and paid for, Forster without warning cancelled orders placed the preceding fall for 3,000 cases of skewers and for another item called "apple sticks." These cancellations cost Farmington about 20% of its business, and when Norton called to inquire about the reason for the cancellation Hodgkins, according to Norton, replied: "If I want it (Farmington) to make a profit, it will; if I don't, it won't." Thereafter Forster's purchases from Farmington declined from about $138,000 in 1954 to about $99,000 in 1955 and to about $33,000 in 1956, ceasing altogether in the spring of that year.

In an effort to offset its dwindling sales to Forster, Farmington began acquiring other outlets for its skewers by increasing its sales to "brokers"-distributors, and later by selling directly to large users including Armour & Co. This new activity in the market changed Farmington from a mere supplier to an active competitor of Forster. The Commission found that in 1957 there were 6 companies competing in the manufacture and sale of skewers in the United States and that Forster had approximately 58% of the market, Farmington about 22% and that the four other companies divided the remaining 20% of the market in varying proportions from 11% to 1%.

The Commission found that the respondents "showed a marked lack of enthusiasm for the price competition introduced into the skewer industry by Farmington's new distributors." It found that in the spring of 1956, after Farmington had set up its distributor organization and thus had recovered from the loss of Forster's patronage, Hodgkins called several times to accuse Norton of allowing his distributors to cut prices and to demand that he stop selling to them. The Commission said: "Respondents' position apparently was that, while they wouldn't buy Farmington's skewers themselves, they wouldn't allow anyone else to buy them either!" On Norton's testimony, denied by Hodgkins, the Commission found that these telephone calls to Norton from Hodgkins culminated in the ultimatum: "I am going to call you back in two days, and if you have not dropped those brokers, I will cut prices on all skewers. *Don't try to follow me* with these cuts, because I have sold skewers for ten cents a thousand in the past and I can and will again, and *that will be the end of you.*" Then when Hodgkins called back two days later for Norton's answer and Norton refused to give up his distributors, the Commission found, again on Norton's testimony denied by Hodgkins, that the latter said: "That is all right. Beginning in June, 1956, I am making a 20 percent cut on all skewers. *Don't try to follow me. If you do, we will put you out of business.*" (Commission's italics in the above quotes)

These were no idle threats. The Commission found that in succeeding months Forster several times cut its prices on skewers across-the-board. At first Farmington did not follow, but eventually it did for it was losing business to Forster. At that juncture the Commission found, in spite of Hodgkins' denial, on the testimony of Norton and a disinterested local attorney-at-law, that Hodgkins tried to buy Farmington out, first by a direct offer to Norton, which he turned down as inadequate, then by attempting to buy up mortgages on Farmington property held by the local attorney, which he refused to sell, and then by trying to get the attorney to persuade Norton to sell. Rebuffed in his attempt to acquire Farmington, Forster cut prices again, this time to below cost. In February, 1958, Farmington went out of business and Forster then put its prices up again.

The Commission found that these price cuts by Forster were "across-the-board," i. e., non-discriminatory, and, although a contributing cause of Farmington's demise, were not "cognizable" under the Act. It used the price cuts, however, plus Hodgkins' telephone threats to put Farmington out of business quoted above and his attempt to buy Farmington out, to show that the respondents' pricing policies were motivated by "predatory intent" [4] to destroy a competitor which, the Commission said and the respondents-petitioners concede, is relevant and should be considered in determining whether certain differences in the prices charged to three purchasers of skewers to be considered presently might have the effect of substantially injuring competition.

The Commission found that at various times before, during and after the price cuts mentioned above, Forster gave a 5% discount on its list prices to one large meat packer, Armour & Co., and to two supply houses selling exclusively to meat packers. The respondents admit these price differences but undertake to justify the discounts to the supply houses on the ground that they were "functional" or trade discounts legitimately granted because of the purchasers' function as wholesalers.

The Act does not sanction "functional" discounts as such. That is to say, it does not permit discounts based solely upon the quantity sold. Section 2 of the original Clayton Act included a proviso that nothing therein contained should prevent "discrimination in price * * * on account of differences in grade, quality or quantity of the commodity sold, or that makes only due allowance for difference in the cost of selling or transportation." This provision was held to permit quantity discounts as such. Goodyear Tire & Rubber Co. v. Federal Trade Commission, 101 F.2d 620 (C.A.6, 1939). But the Robinson-Patman amendment changed the Clayton Act proviso to read: "That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered." This change was made in furtherance of the purpose of Congress "to protect competition from all price differentials except those based in full on cost savings," Federal Trade Commission v. Morton Salt Co., 334 U.S. 37, 44, 68 S.Ct. 822, 827 (1948), thereby establishing, the Court in that case concluded, that "standard quantity discounts are discriminatory within the meaning of the Act, and are prohibited by it whenever they have the defined effect on competition." And, discrimination in price in favor of the two purchasers of skewers mentioned above having been shown, indeed having been admitted, the burden of justifying the discriminations on the basis of cost savings rested upon the respondents under § 2(b) of the Act which provides in material part: "Upon proof being made * * * that

---

4. In the light of our statement of the case the respondents-petitioners' contention that the record does not support the Commission's finding of Hodgkins' predatory intent is an obvious grasp at a straw.

there has been discrimination in price * * * the burden of rebutting the prima-facie case thus made by showing justification shall be upon the person charged with a violation of this section, and unless justification shall be affirmatively shown, the Commission is authorized to issue an order terminating the discrimination." The respondents have not even attempted to carry their burden of rebuttal by showing that their lower prices to the wholesalers were justified by savings in cost.

■ Additionally the respondents contend that the record does not support the Commission's conclusion that their above price discriminations had the defined effect upon competition, which, they say, is that the discriminations were "likely to result in injury to competition." This contention rests upon the erroneous interpretation of the Act pointed out herein above. As we have shown it does not need to appear in order to establish violation of the Act that a discrimination in price is "likely" to have the effect of substantially lessening competition, or of tending to create a monopoly or of injuring, destroying or preventing competition. It is enough to show violation of the Act if it is "reasonably possible," (not even "reasonably probable") [5] that price discrimination "may" have such an effect. Certainly there is enough in the record to show that the respondents' price discriminations in the sale of skewers "might" well have the effect of substantially lessening, injuring or destroying competition with other skewer manufacturers if not a tendency to create a monopoly by eliminating a sole major competitor, Farmington. Another defense applicable to the price discrimination awarded to Armour & Co. will be considered in connection with clothespins to which we now turn.

■ For years Forster had sold round clothespins in substantial quantities in the Pittsburg, Pennsylvania, marketing area. It had about 70% of the Pittsburg clothespin market and only one substantial competitor, Diamond Gardner Corporation, later Diamond National Corporation. In May, 1957, Penley Brothers, a small manufacturer of clothespins in Paris, Maine, entered the Pittsburg market for the first time. In an effort to get some of the business from its well entrenched competitors, Penley offered one case of clothespins free with each purchase of 10 cases. On May 13 it sold 10 cases to a customer giving one case free, on June 4 it sold 30 cases to another customer giving 3 cases free, and on June 24 it sold 20 cases to a third customer giving 2 cases free. After that date it discontinued its practice and gave away no more free goods. Thus in May and June Penley sold 60 cases of clothespins to three customers and gave away 6 cases free.

The respondents heard of Penley's free goods offer from their local broker and sent one of their sales staff from Maine to Pittsburg to investigate. Several buyers for Forster's customers in the area told Forster's representative of Penley's free goods offer, but only one of them identified Penley as the offeror. None of the buyers interviewed had bought from Penley or had received an offer from its sales representative. The respondents concluded from their investigation that Penley's free goods offer was generally available in the area and early in July met Penley's price with an area-wide cut of one free case of clothespins with each 10 cases bought. Penley discontinued its free goods offer late in July, 1957, and the respondents discontinued their free goods offer early in August, 1957, making their last such sale on August 5.

The Commission found that the respondents' gift of free goods had the effect of preventing Penley from gaining entrance into the market and constituted a violation of the Act.

We are satisfied with the Commission's conclusion that the respondents' gift of free clothespins in the area constituted a *prima facie* discrimination in price hav--

---

5. See Mr. Justice Jackson's dissent in part in the Morton Salt Co. case, supra.

ing the harming effect on competition defined in the Act. However, we cannot so summarily brush aside the respondents' so-called "good faith meeting competition" defense under the proviso of § 2 (b) of the Act, quoted in material part in the margin,[6] which permits a seller to rebut a *prima facie* case of discrimination under § 2(a) by showing that his lower price was made in good faith to meet an equally low price of a competitor.[7]

We need not concern ourselves with the legality of Penley's gift of a case of clothespins with each ten cases bought, for it was the "clear Congressional purpose not to sanction by § 2(b) the excuse that the person charged with a violation of the law was merely adopting a similarly unlawful practice of another." Federal Trade Commission v. A. E. Staley Mfg. Co., 324 U.S. 746, 754, 65 S.Ct. 971, 975, 89 L.Ed. 1338 (1945). Our concern is with the standard of proof imposed by the Commission on the respondents to establish their "good faith meeting competition" defense.

The Commission's opinion is not as clear as it might be. Perhaps all that it actually held was that the respondents' extension of, in effect, a 10% lower price to 17 customers who had not received an equally low offer from their competitor, Penley, was such a violent reaction to Penley's rather feeble and tentative attempt to enter the market that it could not be said that the respondents' equally low price was made in good faith. But the Commission said much more than this. It said that a seller to establish the defense must ascertain in advance of his cut in price not only the competitor's price he purports to be meeting but also the identity of the competitor offering the lower price. Otherwise the Commission said " 'offers' by a seller wholly incapable of delivering more than an insignificant volume of goods at the low

price would provide an ambitious competitor having substantial market power (such as the 70% of the market enjoyed by these respondents) with an excuse to 'meet' that price on a massive, area-wide scale, and thus cripple not only the small competitor who furnished the provocation, but more substantial competitors as well."

Then the Commission went a step further. It ruled that to establish the § 2(b) defense the seller must have proof positive before its cut in price of the amount of competitive offers and the names of the bidders who made them. It disposed of the respondents' contention that such specific information would be difficult if not impossible to get with the statement: "We have nothing but respondents' word for the proposition that a buyer will abandon his regular supplier and take on a new one rather than divulge the name and quotation of the latter. Common sense suggests that buyers, when confronted with the fact that sellers are constrained by law to treat all buyers fairly until the buyer seeking a favored price cites chapter and verse about alleged competitive offers, will yield to the law's requirements, thus encouraging fair and above-board competition." We do not agree.

In the first place there is more than the respondent's word for the proposition that buyers would abandon a regular supplier rather than disclose a competitor's offer. There is the categorical testimony of Armour & Co.'s skewer buyer who said it was his and the common practice of buyers never to disclose to sellers the specific offers made by their competitors. In the second place our "common sense" suggests the conclusion opposite to that reached by the Commission. We may not be in as intimate touch with the ways of commerce as the Commission, but we would be naive indeed if we believed that buyers would have any great

---

6. "*Provided, however,* That nothing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price * * * to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor * * *."

7. This defense is also interposed by the respondents with respect to their sales of skewers to Armour & Co.

solicitude for the welfare of their commercial antagonists, sellers. The seller wants the highest price he can get and the buyer wants to buy as cheaply as he can, and to achieve their antagonistic ends neither expects the other, or can be expected, to lay all his cards face up on the table. Battle of wits is the rule. Haggling has ever been the way of the market place. The Commission's requirement is unrealistic.

Moreover, the requirement is stricter than that laid down in Federal Trade Commission v. A. E. Staley Mfg. Co., 324 U.S. 746, 759, 760, 65 S.Ct. 971, 977 (1945), in which the Court said that § 2 (b) "does not require the seller to justify price discriminations by showing that in fact they met a competitive price." Emphasizing that the burden was on the seller to show that his price was made in "good faith" to meet a competitor's, and that the issue of the seller's "good faith" was for the Commission not the courts, the Court said that it agreed with the Commission in that case that "the statute at least requires the seller, who has knowingly discriminated in price to show the existence of facts which would lead a reasonable and prudent person to believe that the granting of a lower price would in fact meet the equally low price of a competitor." This case must go back to the Commission for application to the evidence of the standard of the "reasonable and prudent person" in the situation of the respondents with respect to their sales of skewers to Armour & Co. and their sales of clothespins in the Pittsburg area.

What we have already said disposes directly or indirectly of the respondents' contentions with respect to its sales of ice cream spoons. We can be brief as to this product. The hearing examiner found, and the Commission agreed, that the respondents sold ice cream spoons to two large ice cream manufacturers in the southeastern part of the United States at lower prices than they sold the same product to other customers. There is ample support in the evidence for this finding. And, on the testimony of a former Forster salesman who had handled the accounts, the hearing examiner found, and the Commission agreed, that the discriminations were of a "predatory nature." The salesman said:

"Well now, I can speak out openly. All right. What was said was this. My company, at the time my company was Forster, told me to get the business in the Carolinas. * * * If we don't get it at the price that I had to offer the different ice cream manufacturers, if we lost it, the company that did get it wouldn't make any profit on it. So that is the answer. That is exactly what they told me."

"Who told you that?"

"Well, there is only one man up there that can say anything and that is Ted Hodgkins."

This indicates not healthy business competition which the statute and the anti-trust laws are designed to foster, but price war to the death with victory not to the most skillful and efficient competitor but to the one with the longest purse which the Clayton Act as amended was specifically designed to prevent.[8]

■ The only remaining question in this case is the breadth of the cease and desist order entered by the Commission. That order is broad indeed. But interpreting it in the light of the principles set out by the Court in Federal Trade Commission v. Ruberoid Co., 343 U.S. 470, 475 et seq., 72 S.Ct. 800, 96 L.Ed. 1081 (1952), we do not agree with the dissenting Commissioner who characterized the order as "throwing the book" at the respondents and restricting their "freedom to compete to a wholly unjustifiable degree." We think the order might

8. See Federal Trade Commission v. Anheuser-Busch, Inc., 363 U.S. 536, 543, 80 S.Ct. 1267, 1271 (1960), in which the Court said that § 2(a) of the Clayton Act was born in 1914 "of a desire by Congress to curb the use by financially powerful corporations of localized price cutting tactics which had gravely impaired the competitive position of other sellers."

well be clarified and perhaps somewhat modified, but, since the case must go back to the Commission, we shall not undertake to do so ourselves.

A decree will be entered setting aside the order of the Commission and directing it to take further proceedings not inconsistent with this opinion.