Frank **KOHNER**, Appellant and
Cross-Appellee,

v.

Abraham **WECHSLER**, Appellee and
Cross-Appellant,

and

Manufacturers Hanover Trust Company,
Defendant.

**Nos. 236, 366, Dockets 72–1721, 72–2062.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 18, 1972.

Decided April 6, 1973.

Sidney B. Silverman, New York City (Silverman & Harnes, New York City, and Lawson F. Bernstein, New York City, of counsel), for appellant and cross-appellee.

Nathan Lewin, Washington, D. C. (Miller, Cassidy, Larroca & Lewin, Washington, D. C., of counsel), for appellee and cross-appellant.

Before MOORE, MULLIGAN and TIMBERS, Circuit Judges.

MOORE, Circuit Judge:

Plaintiff, Frank Kohner, brought an action under sections 12(2) and 17(a) of the Securities Act of 1933 and section 10(b) and Rule 10b–5 of the Securities Exchange Act of 1934 against Abraham Wechsler and Manufacturers Hanover Trust Company, wherein he sought to rescind a purchase agreement pursuant to which he agreed to purchase all of the outstanding shares of the Wecolite Company owned by Wechsler. Defendant, Manufacturers Hanover Trust Company, the escrow agent named in an escrow agreement which was a part of the transaction, is not a party to this appeal.

Shortly after the action was commenced, plaintiff sought a preliminary injunction to prevent Wechsler from leaving the country and for consolidation of the trial on the merits with the hearing on the injunction. The motion for consolidation was initially denied by Judge Frankel. After a four-day evidentiary hearing on the preliminary injunction, before Judge Cannella, the court, *sua sponte*, consolidated the hearing and the trial on the merits. From an order denying the preliminary injunction, dismissing the summons and complaint, and terminating the escrow agreement, plaintiff appeals.

The gravamen of plaintiff's complaint centers around the assertion of fraudulent representations allegedly made by the Seller, Wechsler, to Kohner to the effect that Wecolite, the Company purchased, operated in conformity with the law, whereas, in fact, it had violated provisions of the Robinson-Patman Act, had underpaid customs duties, and was engaged in sharp and unethical business practices (withholding commissions and royalties due).

The only issue before the trial court was whether the proof justified rescission. The court found that plaintiff's charges as to violations of the Robinson-Patman Act had not been sustained, that if there were unpaid customs duties, they would very probably amount to the *de minimis* sum of $4,000, and that there was no substance to the charge that Wecolite engaged in unethical business practices.

On appeal, as in the trial court, Kohner conjures up the specter of Wecolite being forced to defend a Federal Trade Commission action for violations of the Robinson-Patman Act as well as a multiplicity of private suits by Wecolite's customers based on these same violations. The trial court found no such violations. Even now there are still no threats of Robinson-Patman actions or suits by the government for unpaid customs duties. If plaintiff, as the new owner of Wecolite, believes that certain of the business practices of his acquired Company are in violation of the law, he is free to remedy these practices, albeit the trial court found no such violations of law. If he does not approve of the Company's business policies, he is equally free to change them. If unpaid customs duties require payment, the indemnity agreement which is part of the purchase agreement is protective. Noting that "[T]he plaintiff, an experienced businessman and a sophisticated investor had many financial advisors to assist him in carefully analyzing defendant Wechsler's business before the sale was finalized," [1] the trial court concluded that plaintiff's motion for a preliminary injunction should be denied and the summons and complaint dismissed. Wechsler cross-appeals the dismissal of his counter-claim for damages for interference with his employment and consulting contracts which were executed in connection with the sale of Wecolite. No proof was adduced at trial as to this claim and Judge Cannella properly dismissed it. We affirm.

Apparently, on its own motion, the trial court added: "The escrow agreement with defendant Manufacturers Hanover Trust Company is hereby terminated and the Court directs that the notes being held in escrow be turned over to defendant Wechsler, and that the legitimate fees incurred by the Bank in the amount of $1,350 be paid by the plaintiff." [2]

The order appealed from must be modified because the escrow agreement and the indemnity agreement were vital parts of the purchase transaction. The purchase price was $650,000. Remaining unpaid is $274,000, consisting of a negotiable note for $124,000 due January 2, 1973, and two non-negotiable notes for $76,500 due January 2, 1973, and $73,500 due October 15, 1974.

Since the trial court did not grant rescission, the purchase agreement remains in full force and effect including the indemnity and escrow provisions. Hence the escrow agreement should not have been terminated. The notes held pursuant thereto should continue to be held in accordance with its terms. Any fees thereunder should be paid in accordance with the terms thereof.

Order as modified affirmed.

MULLIGAN, Circuit Judge (concurring):

I concur in the opinion of Judge Moore.

Appellant Kohner has assumed here and below that once having established

---

I. Kohner v. Wechsler, 72 Civ. 1898. (S.D. N.Y., filed June 16, 1972).

2. *Id.*

that Wecolite was selling the same commodity at different prices to two or more competing buyers, the burden of proof shifted to the appellee Wechsler under the Robinson-Patman Act (15 U.S.C. § 13 (1970)). Thus, under the much maligned decision in *Moss*,[1] appellant has urged that the appellee must bear the burden of proving no possible competitive injury. Moreover, under § 2(b), he has assumed that the appellee has the burden of establishing that Wecolite was meeting and not beating the price of a competitor. I do not think the appellee here had to sustain either burden of proof. The appellant is not the Federal Trade Commission or an injured secondary line competitor bringing a § 2(a) action. The appellant is neither a purchaser of Wecolite products or even a competitor. He is the disappointed buyer not of a commodity but of the business itself. Although the Act is admittedly murky, there is no language in it which gives him a cause of action. The burden of proof provision in § 2(b) is explicitly limited to hearings on complaints brought under the statute. Since this is not such an action the appellant is not entitled to the benefit of the statutory presumption. The appellant buyer of the business has urged that the appellee seller has violated the Act—he therefore has the burden, in my view, of establishing that Wecolite not only discriminated to the possible detriment of its buyers but that it had no § 2(b) defense.[2]

Even if this is not sound and the appellant is to be treated as the plaintiff under the statute, I agree with Judge Timbers that there is no showing of any Robinson-Patman violation. The expert opinion relied upon is bereft of any meaningful survey indicating competitive realities in relevant areas. Absent this we simply have a recitation of cases which can be found in any anti-trust primer culminating in the rather startling prediction that both Wecolite and Kohner face the strong likelihood of both civil and criminal liability in an action brought by the Anti-Trust Division. As Judge Moore has pointed out, no proceeding of any kind ever took place in the past and, as for the future, the appellant is now free to make whatever price structure changes his experts suggest and thus avoid the damages, fines or imprisonment which have been foretold.

TIMBERS, Circuit Judge (concurring):

I concur in the judgment of the Court and in the brief opinion of Judge Moore to the extent that it affirms denial of a preliminary injunction and dismissal of the complaint and counterclaim, but modifies that provision of the order below which terminated the escrow agreement.

In my view, however, certain aspects of the issues on this appeal warrant somewhat fuller discussion, so that the parties, counsel and possibly another Court may have a bit more illumination as to the basis for our judgment affirming the order of the district court as modified.

In short, in my opinion, it is not enough for us simply to say, for example, that the district court's findings of fact support its conclusion that rescission of the purchase agreement was not warranted. Rather, we must determine essentially whether the evidence supports the district court's finding that plaintiff Kohner failed to sustain his burden of proving various statutory violations on the part of defendant Wechsler. Since I believe there was adequate evidence to support the district court's finding and its conclusion that the pur-

1. Samuel H. Moss, Inc. v. FTC, 148 F.2d 378 (2d Cir.), cert. denied, 326 U.S. 734, 66 S.Ct. 44, 90 L.Ed. 438 (1945).

2. Such a burden on the plaintiff in this case is less than that imposed upon the Federal Trade Commission in a legitimate Robinson-Patman Act § 2(f) case directed against a buyer. See Automatic Canteen Co. v. FTC, 346 U.S. 61, 73 S.Ct. 1017, 97 L.Ed. 1454 (1953).

chase agreement should not be rescinded was not clearly erroneous, I concur in the judgment of the Court affirming the order of the district court as modified.

## I.

In order more sharply to focus upon the issues, a somewhat more detailed statement of the events which culminated in the controversy may be helpful.

Wechsler was the owner of Wecolite Company, a small manufacturer of low-priced plastic kitchen gadgets. In 1971, he decided to resettle in Israel. He prepared to sell his Wecolite shares at a public offering. Among the steps taken was the filing of a preliminary prospectus with the SEC.

In the meantime, Kohner, the former owner of a successful toy manufacturing company, had expressed a tentative interest in a private purchase of Wecolite. Negotiations between the two ultimately resulted in an agreed purchase price of $650,000,[1] subject to verification of the Wecolite prospectus and the assorted representations that Wechsler had made concerning the operation of Wecolite.[2] Following Kohner's acceptance of the representations,[3] the parties entered into a 50-page purchase agreement. Included therein were numerous warranties, including warranties of lawfulness, and a provision whereby Wechsler was to be retained by Wecolite for one year as an employee and for three years thereafter as a consultant. Thus, even after the assumption of control by Kohner, the day-to-day management of Wecolite was intended to, and did, remain in Wechsler's hands in the early period following the sale.

Several months after Kohner took over the control of Wecolite, he claims to have become aware that certain of Wecolite's pricing practices were in violation of the Robinson-Patman Act, 15 U.S.C. § 13 (1970).[4] As a result, he hired two persons—a Washington, D.C. attorney and a professor of economics at Columbia University—to determine the ex-

---

1. Included in the purchase price were two non-negotiable promissory notes totalling $150,000 which were to be held in escrow by the Manufacturers Hanover Trust Company as part of a fund for the payment of any successful claims by Kohner against Wechsler arising out of the sale. The district court ordered termination of the escrow agreement and the transfer of the notes to Wechsler. I agree with Judge Moore that that part of the district court's order was erroneous, and I concur in the modification of the order accordingly.

2. Kohner emphasizes that on several occasions during the negotiations express requests were made for guarantees as to the lawfulness of Wecolite's business procedures. Regarding the Robinson-Patman Act claim, the evidence indicates that at the first meeting between Wechsler and Kohner the latter inquired as to Wecolite's pricing policies. Wechsler testified that he answered, "We sell at 50 and 10, the same as stated on the price list. However, in many cases we have to grant additional discounts, bakers' dozens, in some cases 10 per cent, in some cases even a little better than that." Wechsler further testified that that exchange constituted the extent of the parties' discussion of Wecolite's pricing policies.

3. A major source of disagreement is the extent to which Kohner investigated and verified Wechsler's prospectus and representations. Kohner asserts that his accountants ascertained that Wechsler's reports were in accord with proper accounting procedures, and that he refused to enter into the purchase agreement until Wechsler agreed to include such warranties as the one stating that Wecolite "is not prohibited by agreement or law from carrying on its business substantially on the basis now conducted", Purchase and Sale Agreement ¶ 3.2(c), and that it "is not indebted in any amount to any . . . governmental agency for customs duties or taxes on imports under any applicable law. . . ." Purchase and Sale Agreement ¶ 3.4(n). Wechsler, however, points to Kohner's frequent consultations with a housewares expert, the complete access of Kohner's accountants to Wecolite's books (including its invoices), and Kohner's testimony that he read the prospectus thirty times and that he was very conscious of the language and effect of the Robinson-Patman Act.

4. Kohner testified that this knowledge came to him through a letter from a salesman.

istence and extent of Wecolite's statutory violations. Their investigation culminated in an opinion letter in which the view was expressed that Wecolite's marketing policies would subject both Wecolite and Kohner personally to possible civil and/or criminal litigation brought by the FTC, the Department of Justice, or private parties. This conclusion apparently was based upon a study of the variety of prices that Wecolite charged its customers, without regard to the prices quoted by Wecolite's competitors or to any other potential defense to a Robinson-Patman violation provided for in 15 U.S.C. § 13(a) or (b).

Kohner also claims to have discovered that Wecolite was in violation of the United States customs laws, due to its use of a "double-invoicing" scheme. On a number of occasions, as Wechsler admitted, the billing for Wecolite's purchases from Modern Plastics Company, Wecolite's Canadian supplier of plastic jelly molds, was done by means of split invoices. Wechsler also admitted that Wecolite may in fact have paid customs duties on the initially-invoiced portion only. Wechsler's explanation was that the molds were packaged in nests of four and that prior to 1969 they had been billed in terms of nests. In that year, however, Modern Plastics closed its Vermont plant (which had been the outlet dealing with Wecolite). In changing the source of supply, the billing simultaneously was changed to an individual mold, rather than a nest of four, basis. This, according to Wechsler, "caused substantial confusion in [Modern Plastics'] billing, to which the alleged 'double-invoicing' was attributable."

Kohner testified that, if he had known of these alleged statutory violations and liabilities prior to his purchase of Wecolite, he would not have consummated the purchase.

Consequently, on May 8, 1972, Kohner commenced the instant action in the district court for rescission of the agreement to purchase Wecolite. Wechsler counterclaimed for $163,000 on the employment and consulting provision, allegedly lost due to Kohner's interference with that provision of the agreement. Following a hearing on Kohner's motion for a preliminary injunction, the district court consolidated the hearing on that motion with the trial on the merits, in accordance with Kohner's motion pursuant to Fed.R.Civ.P. 65(a)(2). On June 16, 1972, the court denied the motion for a preliminary injunction and dismissed the complaint. At the same time, it ordered that the escrow agreement be terminated and that the notes subject thereto be transferred to Wechsler. On July 20, a separate order was entered dismissing Wechsler's counterclaim for failure of proof.

The essential issue on this appeal is whether the district court was clearly erroneous in its conclusion that Kohner was not entitled to rescission of the purchase agreement because of the alleged undisclosed statutory violations by Wechsler and Wecolite. The rescission relief was sought pursuant to Sections 12(2) and 17(a) of the Securities Act of 1933, 15 U.S.C. §§ 77l(2) and 77q(a) (1970), and Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1970), and Rule 10b-5 promulgated thereunder. In order to understand our ruling on that issue, reference must be made to the substance of the alleged violations of both the Robinson-Patman Act and the customs laws.

## II.

The primary prohibition of Section 2 of the Robinson-Patman Act, 15 U.S.C. § 13 (1970), makes it "unlawful for any person engaged in commerce . . . to discriminate in price between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce . . . ." 15 U.S.C. § 13(a). That prohibition is then made subject to various defenses set forth in the statute. Here, while there is no doubt that Wecolite discriminated in price between its various customers,

there are serious questions as to (1) whether the effect of such discrimination "may be substantially to lessen competition", and (2) whether Wechsler has demonstrated the applicability of any of the statutory defenses.

The rule in this Circuit, unique as it may be, is that, once a plaintiff has shown discrimination in pricing, the burden of proving a lack of the requisite anticompetitive effect shifts to the defendant. Samuel H. Moss, Inc. v. FTC, 148 F.2d 378, 379 (2 Cir.), cert. denied, 326 U.S. 734 (1945).[5] In the present case, there is no question that the alleged practice of granting jobber discounts, ranging in magnitude from 55% to 65%, was proved.[6] Nevertheless, the district court held that "the plaintiff has failed to sustain his burden of proving a violation of Section 2(a) of the Robinson-Patman Act", a conclusion which, under the standards that have evolved in this complex area of the law, we hold is adequately supported by the evidence.

In FTC v. Morton Salt Co., 334 U.S. 37 (1948), the Supreme Court stated the classic "injury to competition" test: that the discriminations need not "in fact have harmed competition, but only that there [be] a reasonable possibility that they 'may' have such an effect."

334 U.S. at 46, quoting from Corn Products Refining Co. v. FTC, 324 U.S. 726, 742 (1945). In so doing, the Court also rejected as a standard the minimal threshold of injury: "the use of the word 'may' was not to prohibit discriminations having 'the mere possibility' of those consequences, but to reach those which would probably have the defined effect on competition." 334 U.S. at 46 n. 14.

In the instant case, Kohner has demonstrated no more than that "mere possibility". Wecolite is a small company, itself having a relatively insignificant effect on competition. In that sense at least, Morton Salt and the other principal cases[7] are distinguishable as presenting situations involving an industry leader whose every action might be presumed to have a "reasonable possibility" of affecting competition, whether harmful or otherwise. In addition, there has been no showing of any harm, actual or reasonably possible, to any customer. For aught that appears from the evidence, Wecolite's pricing policies may indeed have fostered competition by adapting the discount rate to the particular situation of each customer.[8] There is nothing in the record, for example, to suggest such suspect practices as the volume discounts in Morton Salt which

---

5. *Moss* has been both consistently questioned, e. g., Rowe, Price Discrimination Under the Robinson-Patman Act 108 (1962), and effectively limited. Enterprise Industries, Inc. v. Texas Co., 240 F.2d 457, 460 (2 Cir.), cert. denied, 353 U.S. 965 (1957); Sano Petroleum Corp. v. American Oil Co., 187 F.Supp. 345, 353 (E.D.N.Y.1960) (". . . there is no presumption that the proscribed discrimination in price has caused damage to the plaintiff. The burden of proving such damage is always on the plaintiff.") In light of the conclusions that, even under the *Moss* presumption the evidence fails to disclose a reasonable possibility that the price discrimination may substantially lessen competition, Standard Motor Products, Inc. v. FTC, 265 F.2d 674, 676 (2 Cir.), cert. denied, 361 U.S. 826 (1959), and that, even if such a finding were made, Wechsler has established the defense set forth in § 13(b), further consideration of the *Moss* rule is not required.

6. The evidence indicated that Wecolite had granted six different jobber discounts: 50% + 10% (55%); 50% + 10% + 5% (57.75%); 50% + 10% + 7.7% ("baker's dozen") (59.24%); 50% + 10% + 10% (60.5%); 50% + 10% + 15.4% ("double baker's dozen") (63.47%); and straight 65%.

7. See, e. g., Corn Products Refining Co. v. FTC, *supra*; Kroger Co. v. FTC, 438 F.2d 1372 (6 Cir.), cert. denied, 404 U.S. 871 (1971). Cf. Anheuser-Busch, Inc. v. FTC, 289 F.2d 835 (7 Cir. 1961) (primary-line case).

8. The president of one of Wecolite's larger customers testified, for example, that the lower price offered to it could be demanded from all its suppliers because of its ability to provide such services as "preticketing" and inventorying which would not be performed by most other customers.

enabled Morton's largest customers to gain ever-greater advantages. On the contrary, the evidence in the present case shows no consistent pattern of discount variations, no specially-favored customers, and not even remote proof of injury to any person. The *Moss* burden of proof notwithstanding, therefore, no injury to competition has been shown. Consequently no violation of Section 2(a) of the Robinson-Patman Act has been established.

Even if Kohner had sustained his burden of proving a prima facie violation of the Act, however, Wechsler, as the district court correctly held, successfully brought himself within the protection of an express defense provided in Section 2(b), 15 U.S.C. § 13(b) (1970):

> "That nothing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price . . . was made in good faith to meet an equally low price of a competitor. . . ."

The burden of proving the meeting-competition defense of course was on Wechsler. *Cf.* Utah Pie Co. v. Continental Baking Co., 386 U.S. 685, 694 (1967). In sustaining that burden, Wechsler appears to have established a complete absence of a pattern of discriminatory discounts; on the contrary, he has shown that the price differentials were granted on a nonsystematic ad hoc basis, reasonably attributed to the fluctuations in prices quoted by Wecolite's competitors, as well as to other legitimate factors.[9] To establish that defense, Wechsler produced such evidence as the testimony of a Wecolite sales representative, who served under both Wechsler and Kohner,[10] to the effect that additional discounts off the jobber price lists were granted by Wecolite only after Wechsler was satisfied, by invoices or other means, that the lower prices were necessary to meet the prices offered by Wecolite's competitors. This witness also testified that he could not remember any instance in which Wechsler attempted to under-price the competition rather than simply to equal it; and that, Wechsler being in the witness' terms a "frugal" man, it clearly was not Wechsler's practice at any time to charge anything less than competition required.

The only remaining consideration with respect to this defense is whether Wechsler adequately substantiated the particulars of the competitors' prices that Wecolite allegedly was formed to meet. In Corn Products Refining Co. v. FTC, *supra*, 324 U.S. at 741, for example, the Court found insufficient support for the meeting-competition defense, the evidence being described as limited to "each witness' assumption or conclusion that price discriminations were justified by competition". In the instant case, however, testimony to that effect was given by witnesses having personal and intimate knowledge of the particular transactions. Moreover, the accepted rule, and certainly the sensible one, is that a seller is not necessarily required to establish the defense by showing that his price discriminations in fact met the prices offered by his competitors. The burden on the seller is rather to demonstrate

> "that the price was made *in good faith* to meet a competitor's . . . . [T]he statute at least requires the seller, who has knowingly discriminated in price, to show the existence of facts which would lead a reasonable and prudent person to believe that the granting of a lower price would in fact meet the equally low price of a competitor." FTC v. A. E. Staley Mfg. Co., 324 U.S. 746, 759–60 (1945) (emphasis added).

See also, e. g., Forster Mfg. Co. v. FTC, 335 F.2d 47, 55–56 (1 Cir. 1964), cert. denied, 380 U.S. 906 (1965) (remanding "for application to the evidence of the standard of the 'reasonable and prudent

---

9. See, e. g., *supra* note 8.

10. The witness at the time of his testimony was employed by Wecolite, among other manufacturers, and appeared at the trial under subpoena.

person'" a case involving an FTC order which held the meeting-competition defense not to have been established due to a failure to prove the precise amounts of competitive offers and the names of the competitors who made them).

Applying that standard, there is no doubt that the evidence here supports the district court's conclusion that Wechsler sustained his burden of proving the defense. The meeting-competition proviso offers an "absolute defense to a charge of violating § 2(a), notwithstanding the existence of the statutorily prohibited anticompetitive effect." FTC v. Sun Oil Co., 371 U.S. 505, 514 (1963). Wechsler consequently cannot be said to have misrepresented the legality of Wecolite's operation. We hold that the district court's denial of rescission on this ground clearly was warranted.[11]

### III.

The alleged customs laws violation presents an issue of a different species. While it is true that Wechsler offered an explanation for the apparent double-invoicing of purchases from Modern Plastics, it also is true that this explanation does not fit nicely within a statutory defense, as was the case with the Robinson-Patman claim.[12] Indeed, a reading of the district court's opinion discloses an implicit finding that Kohner's contention that Wecolite might be subject to various customs liabilities and penalties was not satisfactorily rebutted by Wechsler. What the court concluded, however, was that the likelihood of mitigation of the total potential liability made the probable liability de minimis, in terms of its effect on Kohner's entering into the purchase contract.

The federal securities laws under which this action was brought have developed a matrix of tests and standards as prerequisities to a suit for rescission or damages. One such prerequisite is that "the facts [allegedly] withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision." Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153–54 (1972). Cf. List v. Fashion Park, Inc., 340 F.2d 457, 462 (2 Cir.), cert. denied, 382 U.S. 811 (1965). In the instant case, the testimony of Kohner's expert witness, an

---

11. In reaching this result, there is no need to decide what additional effect should be credited to the peculiarities of Kohner's position in the transaction. The record indicates that Kohner fairly may be characterized as a "sophisticated investor", Clement A. Evans & Co. v. McAlpine, 434 F.2d 100, 104 (5 Cir. 1970), cert. denied, 402 U.S. 988 (1971), who by his own admission was familiar with the Robinson-Patman Act and was concerned with its applicability to Wecolite. In addition, while the evidence is conflicting as to Kohner's actual knowledge of Wecolite's pricing policies prior to the sale, the fact that his agents investigated the company's books and records may permit an inference of knowledge on the part of Kohner. Cf. Johns Hopkins University v. Hutton, 422 F.2d 1124, 1130–31 (4 Cir. 1970). As a result, Kohner's claim for rescission under the federal securities laws due to the alleged non-disclosure of Robinson-Patman liability might well be said to fall because of the absence of the essential elements of reliance and materiality. In my opinion, however, it is sufficient to hold that the claim fails because Kohner did not prove any misrepresentation in the first instance.

12. Under 19 U.S.C. § 1592 (1970), any person who is guilty of, *inter alia*, "any willful act or omission by means whereof the United States is or may be deprived of the lawful duties or any portion thereof accruing upon the merchandise [described on the import invoice, etc.] . . . shall be subject to forfeiture . . . [of] the whole of the merchandise or the value thereof . . . . ." Section 1592 has been held to require proof of an intent to use fraudulent means in order to subject a person to the prescribed penalties. Jen Dao Chen v. United States, 385 F.2d 939, 942 (9 Cir. 1967). That holding, however, has been questioned. The intent requirement may properly coincide with the language in § 1592 that a false statement, to provide a basis for forfeiture, must be made "without reasonable cause to believe the truth of such statement." United States v. Wagner, 434 F.2d 627, 628–29 (9 Cir. 1970).

attorney experienced in customs matters, indicated that after successful mitigation of the total potential liability,[13] Wecolite probably would have been subject to an assessment of less than $4,000. In a sale involving a purchase price of $650,000 plus extensive additional consideration, the conclusion that $4,000 would not constitute a factor that a reasonable investor would have deemed important in the purchase decision would seem to be reasonable.

Contrary to Kohner's contention on this appeal, the existence of potential criminal liabilities does not necessarily make a company an "illegal" operation, thereby furnishing an unsuspecting purchaser a basis for rescission relief. Rather, Kohner has demonstrated no more than the fact of underpayment of a minimal portion of Wecolite's customs obligation, resulting in a possible assessment in duties and penalties of an insubstantial amount. It is not even clear that Wecolite would in fact be subject to *any* assessment, depending on the success of its explanation as a defense under § 1592.

In any event, assuming that Wechsler knowingly misrepresented Wecolite's liabilities in the warranties of lawfulness and freedom from criminal liabilities, in my view the established standards of materiality preclude rescission of the purchase agreement.[14]

## IV.

Two other issues raised on this appeal deserve brief mention.

First, while the termination of the escrow agreement was erroneous and the district court's order should be modified accordingly,[15] the court correctly refused to upset the employment and consultation provision of the agreement. Although it may be presumed that as a consequence of this lawsuit the parties are on less than ideal terms, the fact remains that both parties satisfied the one-year employment agreement and currently are in the three-year consultation period. It appears that the parties contemplated in this regard that, following the first year after the sale, Wechsler would be residing in Israel and the consultation provision would be no more than a formality tied to additional consideration for the sale. Since we hold that Wechsler has not breached the agreement, there would appear to be no reason for depriving him of any portion of the agreed consideration.

Second, there is no reason or need for a reversal of the district court's dismissal of Wechsler's counterclaim. In its original order, the court failed to dispose of the counterclaim. Three weeks later, on July 7, 1972, Wechsler moved for summary judgment on the counterclaim, or in the alternative for the issuance to Kohner of a certificate under Fed.R.Civ.P. 54(b) to permit an immediate appeal of the June 16 order pending decision on the counterclaim. On July 20, the court dismissed the counterclaim for failure of proof.

Wechsler concedes that, at least with respect to the employment agreement, the counterclaim is moot and presents no issue for trial. What he asks is that the dismissal of the counterclaim be vacated with instructions to enter a judgment of dismissal with prejudice. In view of

---

13. The witness testified that in his experience mitigation was successful in over half the cases brought by the government alleging unpaid customs duties.

14. In addition, as the district court observed, ". . . the plaintiff will not be hurt by his retaining ownership of Wecolite. There is no provision in the agreement which compels the plaintiff to continue defendant Wechsler's price structure". Nor is plaintiff required to continue the method of billing regarding

Modern Plastics. It should be further noted that the contract expressly provides for indemnification by Wechsler of any corporate liabilities incurred during his ownership not reflected in Wecolite's financial statement and books, including the costs of litigation. Purchase and Sale Agreement ¶ 9.1(a), (c). The escrow agreement described at *supra* note 1 was available to Kohner to satisfy the indemnity.

15. See *supra* note 1.

our decision to require enforcement of the consultation agreement, the counter-claim itself appears to be unfounded. Moreover, should it later appear that Kohner is in violation of the consultation agreement, it seems to me that a new cause of action would arise and that the order of July 20 would not preclude Wechsler from seeking appropriate relief.

For the reasons stated above, I concur in the judgment of the Court and in the opinion of Judge Moore to the extent that they affirm the order of the district court as modified.